**COMPAGNA et al. v. HIATT.**

Nos. 2329, 2330.

United States District Court,
N. D. Georgia, Atlanta Division.

Sept. 18, 1951.

Andrews, Nall & Stern, Atlanta, Ga., William Scott Stewart, Chicago, Ill., for petitioners.

J. Ellis Mundy, U. S. Atty., Harvey H. Tisinger, Asst. U. S. Atty., Atlanta, Ga., A. E. Gottshall, Atty. Dept. of Justice, Thomas E. De Wolfe, Atty. Dept. of Justice, Washington, D. C., for respondent.

E. MARVIN UNDERWOOD, District Judge.

The first trial of these habeas corpus cases, which were tried together, resulted in judgments discharging petitioners. Thereafter respondent presented certificates of revocation of the paroles issued by the Parole Board and filed motions for reconsideration of the judgments. Rule to show cause issued and hearing had. At the hearing and upon inquiry by the court, respondent and petitioners stated that they did not desire to present any additional evidence. Thereupon the motions were denied as nothing was to be gained by further hearing without additional evidence. The judgments of this court, 82 F.Supp. 295, were reversed by the Court of Appeals, 178 F.2d 42. Judge Waller dissenting. The Supreme Court affirmed the judgments

of the Court of Appeals "by an equally divided court". 340 U.S. 880, 71 S.Ct. 192.

### Findings of Fact.

The Parole Board has made it clear that the only claims of parole violations are as set out in the referrals; that there were no other complaints; that its action in revoking the paroles was based entirely and solely on conduct of parties subsequent to their release on parole, and that all the evidence they considered is now before the court and contained in the record (R. pp. 114, 137).

Petitioners were indicted and tried together in the United States District Court for the Southern District of New York for violation of the Anti-Racketeering Act. They were convicted and sentenced on December 31, 1943, to terms of ten years in the penitentiary. Because of their good conduct, they were released on parole August 13, 1947, but after unfavorable newspaper publicity and investigations by Congressional Committees and grand juries they were retaken into custody on July 23, 1948, under parole violator warrants issued July 21, 1948, by Judge Rogers, a member of the parole Board. The warrants stated that they were based on "reliable information" of parole violations but gave no information of specific acts. Referrals were issued at the same time, but petitioners had no notice of them or their contents until copies were handed to their counsel on September 2, 1948, the date on which these petitions were filed.

### Compagna Case.

These referrals charged three violations to Compagna and five to Gioe. They were as follows.

As to Compagna: 1, Failure to reveal source of monies used in settlement of Internal Revenue tax, when questioned before a legally constituted body. 2, Failure to conduct himself honorably. 3, Failure to truthfully disclose associates on flight from Kansas City to Chicago following release from Leavenworth.

The violations charged to Gioe are: 1, Change of employment without permission.

2, Failure to truthfully disclose associates on flight from Kansas City to Chicago following release from Leavenworth. 3, Association with persons of bad reputation. 4, Failure to conduct himself honorably. 5, Failure to give a proper accounting of income and expenditures.

The above items are the only complaints of violations and the Board's action in revoking the paroles is based on these alone. (R. p. 130).

It will be observed that the violation charged to Compagna in item 3 is the same transaction charged to Gioe in item 2, and they may be considered together.

Petitioners and a co-defendant, de Lucia, were discharged together from Leavenworth Penitentiary August 13, 1947. They went by bus from the penitentiary to Leavenworth where they were met at the bus station by Mr. Eugene Bernstein, who was Compagna's attorney. The four were driven by a chauffeur to Kansas City Air Port, where they took a plane to Chicago. Upon arrival in Chicago, Gioe was met by his wife but no one met Compagna and de Lucia, who lived near each other. They went to their respective homes in a taxi.

Upon leaving the Penitentiary the parolees were given railroad transportation, but were told by the warden that they could travel by plane at their own expense if they desired. Having traveled by plane they promptly returned the railroad tickets to the warden. Bernstein went to Leavenworth on August 12th to meet Compagna and present certain parole papers at the request of Mrs. Compagna who was ill. The automobile was furnished by Gizzo, a friend of petitioners living in Kansas City who had furnished such transportation on other occasions when Bernstein had visited the Penitentiary to consult with his clients about income tax matters. Before seeing the Warden at the Penitentiary, Bernstein had purchased, at the hotel where he was stopping, two airplane tickets dated August 12th, from Kansas City to Chicago for himself and Compagna. When he later saw the Warden he was

informed that Gioe and de Lucia would be released at the same time. He thereupon tried to secure two additional airplane tickets for the same flight, but was told there were none available. Gizzo said that a friend, who was present, might get tickets for him for that or some other flight and suggested that Bernstein give him the two tickets and he would get two additional or four new ones. The suggestion was adopted and the next morning Bernstein received four new tickets dated August 13th. All the tickets were in Bernstein's name but bore different dates. The two original tickets were evidently sold to other parties without change of name since the flight records show they were used, but they were unknown to Bernstein and petitioners, who had never seen them before, and who had, during the flight of a little over two hours, had no association or conversation with them. (R. pp. 105, 273). There is not a scintilla of evidence as to the identity or reputation of the two unknown passengers although the Parole Board and the Federal Bureau of Investigation made diligent effort to secure such information. (R. pp. 44, 112). Nor is there any evidence that petitioners had any acquaintance, connection or association with them.

Passing now to consideration of the other two allegations of parole violations charged to Compagna in items one and two, the facts are as follows.

In item one he is charged with failure to disclose the source of monies used in settlement of his tax case. This settlement was made by his attorney in 1946 while Compagna was in the penitentiary and all his property under tax lien. (R. p. 101). The money used to pay the claim was brought, by others than Compagna, to attorney Bernstein who received the money and paid the Government. Mr. and Mrs. Compagna and Bernstein all testified that they did not know who the individuals were who furnished the money and made no inquiry. Compagna said he did not know but assumed that they were friends and might have been gamblers and that he did not undertake to search them out after release from prison because he feared

he might get them into trouble and also endanger his parole status by charges of improper association. The money was brought in and received in unusual circumstances. Eight or nine individuals over a period of about thirty days brought in varying amounts in cash and gave them to Bernstein or his secretary. Neither names nor identification were requested or furnished and receipts were given stated the amounts but not the names of the depositors. (R. p. 397). The money was deposited in bank and the Government paid with Bernstein's checks. It is not claimed that he violated his parole by acquiescing in the payment of the tax in the manner described. The payment was made approximately a year before he was released on parole. But the charge is failure to reveal the source of the money. Dr. Killenger testified that he did not believe that Compagna knew the individuals who furnished the money but that he "believed" he knew "the group or the composite". (R. p. 94).

Compagna could not disclose the sources of the money if he did not know them and he denied knowing them. There was no evidence of such fact other than the above circumstances and the suspicions and assumptions of the Board. (R. pp. 40, 94, 97, 98).

The alleged violation set out in item Two is failure to conduct himself honorably. The proof submitted to support this claim is the same as presented in support of the other two charges of violation of parole, items one and three. In the words of Dr. Killinger "his failure to reveal the identity of those two individuals (item three—airplane trip) and also his failure to disclose the source of the money (item one—tax settlement) we concluded that he did not conduct himself honorably by his action in regard to these two items." "Those are the only two instances, your Honor, on which we are setting forth the specific charges". (R. pp. 41, 46).

The facts and circumstances referred to in the consideration of items one and three, therefore, need no further mention since the establishment of violation, item two, depends entirely on proof of violation of

items one and three, or one of them, which has not been established.

It will be seen that, as to the case against Compagna, the entire complaint rests on the charge of failure to reveal two facts, identity of the airplane passengers and the sources of the money to pay tax, which he testified he did not know, and the conclusion that such failure constituted dishonorable conduct. There is no substantial evidence, if any evidence at all, to establish the alleged violations.

### Gioe Case.

Among the five violations of parole charged to Gioe is item two which alleges failure to disclose associates on the airplane flight from Kansas City to Chicago. The charge and evidence to support it were the same as respects item three in the Compagna case which has already been considered. By reference the findings in the Compagna case are made the findings here. There is no evidence to support this charge.

Item one charges "change of employment without permission". This was alleged to be in violation of condition number eleven written on the back of the certificate of parole. The language of the condition is: "I agree to live and work at the place stated in my parole plan and will not change until after I have permission to do so from the parole officer". Note that the permission is to be that of the *parole officer* and that there is no prohibition against the assumption of additional duties for his employer. Under the parole plan which was approved, Mr. Paul Mann, who was President of Consolidated Wire and Associated Companies, a reputable business man and an unimpeached witness in this case, employed Gioe "as a salesman to assist with any new products that we were at the time intending to market, and general work in conjunction with sales that would be assigned to him".

Under this employment Gioe, with permission of his parole officers (R. p. 168 et seq.) visited the five different plants of Consolidated Co., and any new venture which might come to Mann's attention to see if any new propositions were sufficiently attractive to bring to his attention. The latter part of 1947, Gioe brought to Mann's attention the Gem Die and Mold Co., later Tote Brush Co., a reputable and legitimate business. Mann asked him to investigate the prospects of the company with a view to purchase of stock. Dunn and Bradstreet reports were obtained and Gioe procured from the Gem Die Company statements made by its auditors and some of its inventories which he checked and studied. He recommended the purchase of stock by Mann who bought to the extent of about $22,000. Gioe, as Mann's employee, went to the company's office from time to time to check auditor's statements, inventories and sales and to get other information from its president Mr. Ted Stacey. He did nothing for the Gem Die Company and received no compensation from it, but was acting exclusively for Mann. (R. p. 164). Gioe kept his parole officers informed as to what he was doing and they approved (R. p. 304) and gave permission for such activities on behalf of Mann. (R. p. 168). Gioe's dealings were exclusively with Stacey, a reputable business man with no criminal record (R. p. 340, 369). Philip Meisei was secretary and treasurer of the company but Gioe never saw or had any dealings with him. His brother Sam Meisei was a stockholder in the company, but was inactive and Gioe never saw him either. The two Meisei brothers had, when young, each been convicted of crime fifteen or twenty years before and had some latter arrests, which were dismissed without prosecution. These were the only persons connected with the company whose suspected association with Gioe was questioned, (R. p. 362), but the evidence showed that he had no dealings with them whatsoever and had not even seen them for many years.

Later Mann and Gioe decided that Gioe should himself invest in the company and take over some managerial duties. Before doing so, however, they applied to the parole officers for permission. (R. p. 341–2). While waiting for permission, he furnished the officers with full information. There was no question as to Gioe's acts as Mann's employee (R. p. 167–170), but only as to

whether permission should be granted for him to become active in the management of the Gem Die Company's affairs. There were no complaints or criticisms from the parole officers or from any other source about what he was doing (R. p. 173), but on the other hand the officers, with full knowledge of the facts, granted permission to Gioe to act for Mann in his dealings with the company. (R. p. 304). None of the parole officers was called as a witness nor their testimony taken, but their official letters and reports show clearly that they had no complaint to make but on the other hand found that Gioe was meticulous in complying with the conditions of his parole. In his letter to parole executive Urich, dated March 8, 1948, Chief Probation Officer Fisher said of Gioe; "up to the present time we have had no complaints either from Chicago Police Department, the Chicago Crime Commission or any law enforcing officers relative to this subject. Mr. Headis has an opportunity to contact personally a representative of the Chicago Crime Commission three times weekly. In his relationship with the office, subject has maintained a very cooperative attitude. He has contacted the office relative to even minor detail and has hesitated, as far as we can determine, to make a move without first consulting the office". Gioe did not leave or intend to leave Mann's employment, but only with permission first had, to take on some managerial work with Gem Die Co. in addition to his employment with Mann. (R. p. 169). Permission to assume managerial duties with Gem Die Co. was not given and he never became an employee or financially interested in the company. There was no change of employment without permission of his parole officer.

The next charge of violation is item three, "association with persons of bad reputation". The only improper association claimed is the alleged association with the two unidentified passengers on the airplane trip and with Philip and Sam Mesei in connection with the Gem Die Co. transactions. (R. p. 362). As to the airplane passengers, the evidence does not show who they were or whether their reputations were good or bad or that petitioners knew them or had ever associated with them. As to Philip and Sam Mesei, the evidence shows that, although Gioe had known them for many years, he had not seen, or associated, or dealt with them during his parole.

The charge in item four is failure to conduct himself honorably. There was no evidence in support of this item other than the evidence submitted as proof of the other items charged, which was relied upon entirely to prove item four (R. p. 80) but which does not sustain the charge.

The last charge, item five, is failure to give a proper accounting of income and expenditures. The evidence on this item is exceedingly meager and consists of a single report dated 5th of December 1947 and a few questions about it. This report showed income of $300 per month from salary, which was correct, and expenditures of $575. The difference of $275 was explained by Gioe to his parole officer as having been made up of $175 rent paid by his wife, as she had done for years, and of $100 taken from past savings which he did not consider income and which he kept in a safety deposit box where he and his wife kept a reserve. This $100 was included in expenditures but not as income because he did not think it was income but capital accrued from past savings. (R. pp. 366–8). An examination of the reports (respondent's Exhibit No. 20), which was offered as typical, shows that it was dated December 5, 1947, and that it only called for "expenditures" and under the heading "money received", for "earnings from employment" and "other income (specify)". His reports were prepared with the aid of his parole officer and approved by him. After the congressional investigation at the request of and with the assistance of the parole officer some reports, previously submitted, were more fully filled in and again approved.

## Compagna and Gioe.

Members of the Board as late as a few weeks before the revocations of parole, with knowledge of the testimony of pa-

rolees before the Congressional Committee relating to the same matters now charged as violations, themselves stated to the Committee that parolees were good risks and that up to that time they knew of no facts which would justify revocations of their paroles. There is no evidence of any new or additional facts coming to their attention from the date of their testimony to the date of the revocations. The parole officers were also reporting up to a late date that the parolees were cooperative and adjusting well; that they had received no complaints and, although then advised of conduct now complained of, made no reports of parole violation.

### Conclusions of Law.

The majority Decision of the Court of Appeals is now the Law of cases and will of course be meticulously followed. It remains only to construe the opinion as a whole and apply it to the facts as above found.

■ I take it as settled by the opinion that the parole violator warrants, which this Court held to be void, have become unimportant even if the warrants "were irregular" since "they served to bring the parolees before the Board" [178 F.2d 42, 46] and that this feature is no longer in the case. It is also settled, as far as these cases are concerned, that the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq. has no application to the Board and that the "appearances" afforded parolees were sufficient compliance with the law. The Court of Appeals also held that "the court had no part in the Board's deliberations about the paroles", but this ruling places no restriction upon this Court to exercise its well recognized power after the termination of the Board's deliberations and the exhaustion of the administrative authority. I do not understand that the constitutional provision declaring that "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it", Art. 1, sec. 9, cl. 2, and the statute granting to the Federal Courts "power to grant writs of habeas corpus for the purpose of an inquiry into the cause of restraint of liberty" 28 U.S. C.A. 452 [now § 2241] and "to dispose of the party as law and justice require" 28 U.S.C.A. 461 [now § 2243], are inapplicable or that the Court of Appeals intended to hold them inapplicable in cases where orders revoking paroles are claimed to be void.

Here it is claimed the restraint is illegal because the orders of revocation under which the parolees are held are void for want of substantial evidence to justify them. If the orders are void the restraint is illegal and parolees should be discharged from prison walls but not to complete liberty but to restricted liberty in the constructive custody of the Attorney General under the supervision of the Parole Board and subject to its power to modify or revoke the paroles in the exercise of a legal discretion.

■ The Board has wide discretion, but it is a legal discretion, and orders of revocation of paroles without substantial evidence to justify them would not be the exercise but the abuse of discretion. Such orders would be arbitrary and total nullities.

■ The difference between granting a parole and the revocation of parole must be borne in mind. The former is a matter of grace and the discretion of the Board almost unlimited, although the subject is still "entitled to fair treatment, and is not to be made the victim of whim or caprice", Burns v. U. S., 287 U.S. 216, 223, 53 S.Ct. 154, 156, 77 L.Ed. 266, while the latter involves the legal right of the parolee to supervised liberty as long as he complies with the terms of his parole. Where he has been deprived wrongfully of such liberty and returned to prison he is entitled in a habeas corpus to have the restraint enquired into.

It is inconceivable that Congress intended to confer upon the Board the arbitrary power to call back, without substantial evidence of parole violation, these parolees to a further imprisonment of approximately seven years no matter how blameless their

conduct may have been while on parole. Hollandsworth v. U. S., 4 Cir., 34 F.2d 423, 428.

The parole system, which marks a great and wise advance in penology, will lose public confidence and effectiveness unless it is administered with independence, courage, fairness and justice. The courts as well as the Board should be alert to safeguard against arbitrary action.

The majority opinion holds that habeas corpus will not lie "to test the sufficiency of *information* of parole violation to justify the Board's *warrant*", not the sufficiency of the evidence to justify the *order of revocation,* and does not question the Court's power to enquire into the legality of the restraint under such orders and to determine whether they are total nullities because unsupported by substantial evidence. On the contrary the Court of Appeals has directed this Court to afford opportunity to petitioners "to present, if they can, a case of total nullity of the orders revoking their paroles", which involves of necessity consideration of the factual basis of such orders.

It remains only to apply these conclusions of law to the facts as found.

As to the case of Compagna, the charges of three violations of parole resolve themselves into the single question of fact whether he knew the two unidentified airplane passengers and the source of the money used to pay his Federal Tax. If he was ignorant of these things, he of course could not disclose them and his failure to do so could not support the charge of dishonorable conduct. There is, then, left for determination the single question of whether there was any substantial evidence, or indeed any evidence at all, to show knowledge of Compagna of the vital facts. There is no direct evidence (R. p. 98) of such knowledge, which Compagna denies, but only inferences and conclusions drawn solely from what, according to Dr. Killinger's testimony, the Board "felt", "assumed", or "believed" and "that is all". (R. pp. 39, 40). With respect to the source of tax money, Dr. Killinger testified "I can't say that I know the exact identity of the individual or that Louis (Compagna) knows the individual". (R. p. 94).

Suspicion, belief, assumption and conclusions alone are not evidence and are not sufficient to justify the revocation of parole. I conclude, therefore, that the order of revocation of Compagna's parole was arbitrary and a total nullity, because unsupported by substantial evidence, or any evidence, of parole violations and that he should be discharged as a reinstated parolee.

Passing to Gioe's case, what has been said in Compagna's case with reference to the alleged violation of parole rising out of the airplane incident is equally applicable here. There is no evidence to justify the revocation of parole on this charge.

The Board also found that Gioe had violated item eleven of his parole "in that he became engaged in the activities of a corporation other than that for which he had authority to work". There is no evidence to support this charge. The evidence indisputably shows that he never worked for or received any compensation from such corporation, the Gem Die & Mold Co. Any activities in connection with it were not the activities of that company but were activities on behalf of his employer. There was no change of employers and if there was any change of employment it was the result of complying with his employer's request to perform innocent duties which the Board has found to be in addition to those of his original employment. It is possible to so construe this condition of the parole, but it would be highly technical and one that a parolee would hardly envision. But whether this construction be valid or incorrect is unimportant since this condition of parole expressly provides for such change with permission of the *Parole Officer,* which in this case was given. It was Gioe's request for permission to enter upon managerial duties with the Gem Die Co., which he never did, that was withheld for the Board's approval. The Board could have overruled the permission to assume additional duties granted by the parole officer, but it did not and, if it had, it could not predicate parole vi-

olation upon past acts done with approval of the parole officer, but only upon conduct after the Board's action. Furthermore, there is in item eleven no prohibition against assuming additional duties at the request of the employer.

 The next charge of violation is "associating with persons of bad reputation". The only persons alleged as answering this description, other than the unidentified airplane passengers, with whom Gioe is accused of associating are Philip Mesei and Sam Mesei. The evidence is that he had not seen them during his parole and had had no dealings or association with them whatsoever in connection with the Gem Die Co. or any other matter. There was no evidence to contradict this. This charge fails because of total absence of evidence.

The next charge alleges failure to conduct himself honorably. The evidence offered as to the other alleged violations is tendered as the sole proof of this. Since the others have failed of proof, so does this one because entirely dependant for support upon the establishment of the other alleged violations.

The last violation alleged is failure to give a proper accounting of income and expenditures. Only reference to the findings of fact is necessary to show that the only criticism of the reports was the inclusion in "expenditures" of $175 rent paid by his wife and failure to include under "money received" the $100 which he stated he had taken from savings and did not consider income. These facts were known to the parole officer at the time the reports were approved by him and are unsubstantial evidence of violation of this condition of parole.

### Summary Conclusion.

Respondent's chief reliance was on the insistence of the Board that it had absolute and unreviewable discretion to revoke the paroles and that substantial evidence of violations was not necessary to uphold its action. This contention is, in my opinion, not sound. I conclude such evidence is necessary and that the records show no substantial evidence of violations of parole by either of petitioners and that the orders revoking their paroles are arbitrary and total nullities, that the restraint thereunder is illegal, and that they should be discharged, not to complete liberty, but to conditional liberty in the custody of the Attorney General, under the supervision of the Parole Board as reinstated parolees.

Judgments to this effect will be entered accordingly.